WESTERN LEASING COMPANY *et al.*, Plaintiffs-Appellees, *v.* G. McKEE KIRKPATRICK, Defendant-Appellant—(RIGHT GIRL AND RIGHT MAN TEMPORARY SERVICE, INC., Defendant.)

(No. 56619;

First District—March 10, 1972.

Lord, Bissell & Brook, of Chicago, (Richard F. Johnson and Robert A. Knuti, of counsel,) for appellant.

Elliott, Carrane, Uruba & Wayt, of Chicago, (Robert S. Wayt, of counsel,) for appellees.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

This is an appeal from an interlocutory order temporarily enjoining defendant-appellant G. McKee Kirkpatrick (hereinafter defendant) from breaching a covenant not to directly or indirectly compete with plaintiff McKee, Inc., in its line of business pending a final hearing on the merits, and enjoining defendant Right Girl and Right Man Temporary Service, Inc., (hereinafter Right Girl) defendant's present employer and a competitor of plaintiff McKee, Inc., from employing defendant until said hearing. The other plaintiff in this action is Western Leasing Company which became the principal shareholder of McKee, Inc., by purchasing defendant's stock therein.

On appeal defendant contends that the preliminary injunction was erroneously issued because (1) plaintiffs failed to demonstrate that they would be irreparably injured if the preliminary injunction did not issue and (2) plaintiffs failed to establish the probability of success on the merits.

McKee, Inc., was formed in September 1968 with defendant as its president and principal stockholder. It is engaged in the business of providing temporary office help. Sales and promotional efforts are made under its trade name Insta Girl, and we will refer to the company as Insta Girl from time to time throughout this opinion. McKee, Inc., and defendant became the subject of an Internal Revenue Service (IRS) investigation due to unpaid withholding taxes of McKee, Inc., in the amount of $54,000. Defendant was told that the IRS would "look to him" if McKee, Inc., failed to pay the back taxes. In order to save the company, defendant, in essence, agreed to sell his shares to plaintiff Western Leasing Company for $10 and other consideration. Western Leasing, as McKee, Inc.'s new principal stockholder, was to immediately reduce defendant's liability to the IRS by a $15,000 cash payment and guarantee the payment of an additional $25,000 on a schedule of payments. The stock purchase agreement was signed on June 21, 1971. Paragraph 3 of said agreement stated:

"[Defendant] * * * hereby agrees that he will not engage directly or indirectly in any line of activity which might be competitive with or have a detrimental effect on McKee, Inc., for a period of three years within an area of fifty miles from the Chicago downtown post office, nor will he become an employee of or in any way contact any competitive firm during such period of time within such area."

Defendant remained an employee of McKee, Inc., (Insta Girl) until

September 9, 1971. On September 13 he began employment with defendant Right Girl, a competitor of Insta Girl. Gordon Lind, the present president of Insta Girl, learned of defendant's employment with Right Girl on September 15. On October 5 plaintiffs filed a complaint alleging a violation of the covenant not to compete. On October 12 they filed a motion for a preliminary injunction.

At the hearing on the motion Gordon Lind and the defendant testified. Lind stated that he came to work for Insta Girl in May 1970. At that time defendant was president of Insta Girl and in addition to conducting the financial end of the business handled 90% of the sales work. Insta Girl had three other full time employees. The company has never supplied office help to companies outside the Chicago area. At the time the defendant sold his interest in Insta Girl, the company was discussing the possibility of raising additional revenue by setting up franchising companies in the outlying area; this is why it sought to expand the protective area in the covenant not to compete to 50 miles. The three year restriction on defendant's activities was determined by approximating the length of time it would take Insta Girl to pay off the indebtedness to the IRS. Insta Girl has about 15 major accounts that make up 70% to 80% of its business. Lind further testified that the defendant had contacted five of Insta Girl's major accounts since his termination and that "there were others." On cross-examination Lind stated that after joining the company, the primary interest for sales was on himself; he had the major contact with all the customers. Defendant, as president of the company, still met with customers on a daily basis by way of luncheons. The majority of Insta Girl customers use other temporary help services also. A "primary supplier" is one which supplies 50% or 90% of the temporary help needs of a particular business. Lind didn't know if Insta Girl was a major or smaller supplier to most of its accounts. Sales are solicited by personal contacts, telephone calls ("pumping") and mail advertising. If someone called Insta Girl for temporary help, he would deal with one of the company's counselors. Lind stated that the slowest business period for Insta Girl is the summer. Defendant left Insta Girl on September 15, 1971. Since that time Insta Girl has lost none of its clients but as of October 12 (the date of the hearing) business has not improved following the slow summer period as it usually does.

The defendant testified that he is presently employed with defendant Right Girl. His name, G. McKee Kirkpatrick, is not synonymous with McKee, Inc., since the company's stationary, time cards and business cards have Insta Girl on them and promotional activities are also done under the name Insta Girl. In his last year with Insta Girl the company

had not grown; there was a recession in the industry as well as the economy. But Insta Girl was growing "as to the amount of business from the temporary help companies in Chicago." Defendant was the prime salesman for Insta Girl until Gordon Lind was hired in May 1970. When asked if "he [Lind] more or less took over your function?" defendant responded, "In the Sales Department capacity; yes sir." Defendant was relieved of the bulk of the outside customer contact and would call on large accounts no more than once a month. His present work with Right Girl includes outside solicitation, testing new procedures, recruiting, working on the franchising program and putting manuals together. Since leaving Insta Girl defendant has called on approximately 16 customers of Insta Girl. But these businesses are also customers of Right Girl and other firms in the employment field. To defendant's knowledge Insta Girl has never had a customer as far as 50 miles from the downtown post office. Ninety percent of Insta Girl's sales volume was to businesses within three miles of its office at 25 East Washington and the balance was within the city limits. At least 90% of Insta Girl's clients also use other services; "Very rarely will they deal with one service company exclusively." As a whole Insta Girl provided 10% of the temporary services for its clients. The turnover in the industry is quite rapid. Insta Girl never started a franchising program.

*Opinion*

■■ A preliminary injunction is an extraordinary remedy. Therefore, it is a prerequisite to the awarding of such relief that a party clearly show that he will be irreparably damaged if the injunction does not issue (*County of DuPage v. Robinette*, 77 Ill.App.2d 167, 170, 221 N.E.2d 769; *Triangle Sign Co. v. Randolph and State Property*, 16 Ill. App.2d 21, 30, 147 N.E.2d 451), and that there is a probability of ultimate success on the merits. (*Schlicksup Drug Co., Inc. v. Schlicksup*, 129 Ill.App.2d 181, 186, 262 N.E.2d 713.) The granting or denial of the preliminary injunction is largely in the sound discretion of the chancellor but review is afforded to determine if he has abused that discretion. *Schlicksup Drug Co., Inc. v. Schlicksup, supra*, at 186.

■■ On appeal defendant contends that plaintiffs failed to make a requisite showing of either of the elements set forth above.

We believe that plaintiffs failed to show that they would be irreparably damaged if defendant were to remain in the employment of Right Girl pending a full trial on the merits. In view of this position, it will be unnecessary to discuss the ultimate issue of whether the subject covenant not to compete is enforceable.

The evidence is undisputed that when Gordon Lind came to work for

Insta Girl in May 1970, he gradually displaced defendant as the main sales representative of the company. Defendant only maintained contact with Insta Girl customers through business luncheons. Perhaps this is reflected in Lind's testimony that Insta Girl has lost none of its clients since defendant left as an employee on September 15, 1971.

It is true that defendant has called on customers of Insta Girl in his capacity as a Right Girl employee. However, this fact takes on less importance when one notes that these businesses were not only customers of Insta Girl but of Right Girl and other temporary service companies as well. This is in accord with the trade practice that a particular business will generally use several temporary service companies to fulfill its need for temporary help.

The other evidence plaintiffs presented as probative of the issue of irreparable harm is that sales of Insta Girl have not picked up following the slow summer period. But we feel that this fact does not justify the issuance of the injunction, particularly when we take note of the fact that defendant started his employment with Right Girl on September 13, 1971, and plaintiffs' witness was testifying at a hearing held on October 12, 1971. It does not show the great urgency usually surrounding the granting of such relief.

Therefore we feel that the issuance of the preliminary injunction was unwarranted since plaintiffs failed to clearly show that they would be irreparably harmed if the injunction did not issue.

The order of the circuit court is reversed.

Order reversed.

LORENZ, P. J., and ENGLISH, J., concur.